**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHLOE REY,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **2:15-cv-248** |
| **v.** | ) |
| | ) |
| **UNIVERSITY OF PITTSBURGH SCHOOL OF** | ) |
| **DENTAL MEDICINE,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## <u>MEMORANDUM OPINION AND ORDER OF COURT</u>

Pending before the Court is a MOTION FOR SUMMARY JUDGMENT (ECF No. 23) filed by Defendant University of Pittsburgh School of Dental Medicine (the "University").[1]  The issues have been fully-briefed by the University and Plaintiff Chloe Rey in their memoranda (ECF No. 24, 30, 36), and the factual record has been thoroughly developed via their Concise Statements of Material Facts ("CSMF"), Responsive/Counter Statements of Facts ("RSOF"/"Counter-CSMF"), appendices and exhibits (ECF No. 25, 26, 30-1, 30-2, 32, 33). Accordingly, the motion is ripe for disposition.

### I.    Background

The following background is taken from the Court's independent review of the motion for summary judgment, the filings in support and opposition thereto, and the record as a whole.

#### A.  Factual Background

Plaintiff Chloe Rey Kelly ("Rey") is a twenty-seven-year-old woman who applied for, received, and accepted admission into the University's School of Dental Medicine ("SDM") first

---

1.  Plaintiff named the "University of Pittsburgh School of Dental Medicine" as the Defendant. In its filings, Defendant identifies itself as the "University of Pittsburgh – of the Commonwealth System of Higher Education."

professional program for the fall semester of 2013.  The SDM accepts only eighty students per year into this program.  As part of her financial aid package, the SDM awarded Rey a diversity scholarship totaling $8,000 per year, provided that she maintained a 3.5 grade point average ("GPA").  Rey's parents are of Cuban descent, and she is fluent in Spanish.

After her acceptance, Rey and her then-fiancé moved from North Carolina to Pittsburgh, Pennsylvania in July 2013.  They planned to marry in April 2014 at a wedding in North Carolina for approximately two-hundred people, followed by a week-long honeymoon in St. Croix.[2]

### 1. Rey's Tenure at the SDM

Before the fall semester began, Rey attended two orientation sessions at the SDM: a three-day session in June 2013 and another in August 2013.  At some point, Rey also received and became familiar with the student handbook for SDM students.

The student handbook contains a section entitled "PROTOCOL FOR GRADING AND PROMOTION OF FIRST PROFESSIONAL DENTAL STUDENTS."  It discusses the SDM Student Promotions Committee ("SPC"), which is responsible for monitoring students' academic progress in their first year of the program.  During Rey's tenure as a SDM student, Dr. Kurt Summersgill served as the Chair of the SPC.

The student handbook states that the SPC may recommend dismissal to the Office of Academic Affairs when a student receives "[a] cumulative GPA less than the minimum 2.60 at the end of the academic year."  Def.'s Ex. A-5, ECF No. 26-5 at 25.  It further clarifies that "[i]f at the end of the spring term of the student's first year, his/her cumulative GPA is less than 2.60, he/she will be dismissed and is eligible to apply for re-admission as a first year student."  *Id.*

---

2.  According to Rey, the couple became engaged in August 2012, set the wedding date in North Carolina prior to her admittance into the SDM, and finalized all plans for the wedding before the commencement of the academic year.  *See* RSOF at 1, ¶ 6.

This GPA cut-off is set by the SDM rather than any accrediting body, licensure board, or governmental department/agency.

At the conclusion of the fall 2013 semester, Rey had received two grades of "C," which placed her on academic warning under the guidelines. Rey had also attained a GPA of 2.60.

On January 8, 2014, Dr. Summersgill sent Rey an academic warning letter in which the SPC encouraged her to obtain assistance from faculty in the areas where she needed additional help. The SPC further advised Rey to contact Dr. Karen Nedwick-Castro, her faculty coordinator, if she had any questions regarding the academic warning.

The following day, Rey met with Dr. Nedwick-Castro to discuss her grades. During the meeting, Dr. Nedwick-Catro provided Rey with general recommendations to improve her academic performance, such as contacting her professor(s), hiring a tutor, or joining a study group. They also discussed Rey's professional experience and their common research interests.

Afterward, Rey did not meet with any other faculty members to discuss her status on academic warning, hire a tutor, or seek assistance from her upper-classmate mentor. At the same time, Rey attended a study group as well as one session with a second-year student who volunteered to tutor first-year students in gross anatomy.

Toward the end of the spring semester, Rey sought and received permission from two course directors to take their finals early so that she could fly to North Carolina for her wedding on the weekend of April 25, 2015. Rey had not previously told any faculty member that her wedding was planned near final exams. Be that as it may, Rey took nine finals during the spring 2014 semester, but many of them were not weighted any more heavily than the other tests taken over the course of the semester.

While on her honeymoon, Rey learned that her final GPA for the semester was 2.260. Her cumulative GPA was 2.446. As such, Rey ranked last (80/80) in her class.[3] Rey had, however, passed all of her classes with a grade of "C" or higher. In other words, Rey did not receive a "D" or "F" grade in any class that she took in her first year dental school curriculum.

### 2. Rey's Dismissal from the SDM

On May 5, 2014, the first day of the summer 2014 semester, Rey met with Dr. Summersgill to discuss her academic standing. At the meeting, Dr. Summersgill explained that the student promotion guidelines as set forth in the student handbook were straightforward with respect to a first year GPA below the 2.60 threshold. Dr. Summersgill also advised Rey to still attend her summer classes and try to maintain good relationships with all of her course directors.

On May 8, 2014, the SPC first met to discuss Rey's academic performance. The voting members of the SPC were Dr. Kurt Summersgill, Dr. David Veronesi, Dr. Karen Nedwick-Castro, Dr. Nina Markovic, and Dr. Joseph Petrone. Dr. Jean O'Donnell, Dr. Kenneth Etzel, and Dr. Christine Wankiiri-Hale attended the meeting *ex-officio*. At the meeting, Rey's wedding was allegedly a topic of conversation (although it is unclear what, if anything, was said).[4] Ultimately, the SPC voted 5-0 in favor of dismissing Rey from the first degree program, with the option to withdraw and reapply to the first year class of 2019, which would begin in the fall semester of 2015, with no guarantee of re-admission. Rey could not apply for the Class of 2018 because eighty students had already been selected.

---

3. To be sure, the academic warning, academic probation, suspension, and dismissal criteria in the student handbook are based on a student's course grades / GPA and not overall class rank.

4. Rey previously discussed her wedding with Dr. Etzel, who granted her request to move her final exam for his class to accommodate her wedding schedule. Dr. Etzel testified that nobody on the SPC questioned Rey's judgment as far as the scheduling of her wedding.

On May 9, 2014, Dr. Etzel met with Rey and informed her that the SPC had recommended dismissal. Around this time, Rey also met with Dr. Summersgill who informed her that the SPC had only made a recommendation and that Dr. O'Donnell, as the Associate Dean for Academic Affairs, could accept, reject, or change that recommendation. Ultimately, Dr. O'Donnell accepted the SPC's recommendation to dismiss Rey from the program.

On May 19, 2014, Rey received a formal dismissal letter from the SDM. In the letter, Rey was advised of her options, including her right to appeal the decision. The student handbook sets forth the process to initiate a Level I appeal to the SPC, and if unsuccessful, a Level II appeal to the Dean. Rey immediately decided to appeal.

Before her appeal, however, Rey and her father met with Dr. Etzel on May 20, 2014. In that meeting, Dr. Etzel explained that Rey would have to repeat the first year of the program due to her performance. Dr. Etzel further explained that repeating the year would be to Rey's advantage because she did not perform well and would need this material to become a better dentist. Rey informed Dr. Etzel that she would not reapply to the SDM, insisting that she desired to stay with her current classmates. Rey has also cited the financial burden of repeating the first year (an extra $90,0000 in student loan debt) as a basis for her decision.

Later that day, Rey and her father also met with Dr. Summersgill and Dr. O'Donnell. In this meeting, Rey explained that she had some anxiety issues and that her father had heart problems at her age, which she feared experiencing. Rey also asked to continue on with her dental degree program, but reiterated that she refused to reapply and repeat her first year.

### 3. Rey's Appeal(s) of the Dismissal from the SDM

In anticipation of her Level I appeal to the SPC, Rey visited her therapist at the University Counseling Center on May 20, 2104 and asked her to write a letter in support. The

letter explained that Rey first went to the University Counseling Center on January 15, 2014 concerned about a history of test anxiety that had increased in severity with the start of dental school. The letter further explained that Rey began taking psychotropic medication – which can take four-six weeks to show effectiveness – at the end of March 2014. As such, the therapist "suspect[ed] that had [they] pursued medication earlier in the semester, [Rey's] symptoms would have abated soon and her overall performance would have benefited." Def.'s Ex. A-6, ECF No. 26-6 at 13.

Aside from obtaining this letter, Rey also prepared a personal written statement to the SPC in support of her appeal, outlining "[t]hree significantly stressful events" which reportedly contributed to her poor academic performance in her first year of dental school. *Id.* at 18. First, Rey explained that her father had his second heart attack under the age of fifty in February 2014. Second, Rey explained that she experienced her first panic attack before the microbiology final in December 2013 (the last final of her first semester), leading her to believe that she was having a cardiac event, just as her father had experienced a heart attack at an early age.[5] As the letter indicates, Rey sought treatment from the student health center immediately following her microbiology exam and later reached out to the University's Student Health Services and

---

5. Moreover, Rey alleges that she suffers from severe panic disorder, which affects her ability to concentrate and study. Rey further alleges that she had her first panic attack the night before her microbiology final. Rey did not seek medical treatment that night, and she did not disclose her alleged disability to her course director before taking the final examination. For her part, Rey now contends that she attempted to discuss the issue with her course director before the exam but could not do so because she was running late. Rey did, however, discuss her physical condition with Dr. Etzel the morning of the exam. According to Plaintiff, Dr. Etzel assured Rey that she "was fine" and "not to worry." Dep. of Rey, Def.'s Ex. A-1, ECF No. 26-1 at 37. After the final exam, Rey exchanged e-mails with the course director who ultimately informed her that her performance on the final exam dropped her average below her level of performance for the rest of the course.

Counseling Center, which began prescribing Rey medication for anxiety in March 2014.[6]  Third, Rey explained that the anticipation of her April 2014 wedding "undoubtedly affected [her] academic performance" and that taking two of her finals early "ended up hurting [her]."  *Id.* at 19.  The letter fails to mention that Rey only disclosed her father's health condition to one faculty member prior to receiving her grades and that she never sought any accommodations or leave of absence as a result.  It also fails to mention that Rey did not seek any accommodations from her spring 2014 course directors for her stress/anxiety or disclose her alleged severe panic disorder to them or the SPC prior to her Level I appeal.[7]

On June 5, 2014, the SPC met with Rey to formally hear her Level I appeal.  The SPC's minutes from that day reflect what allegedly transpired at the hearing:

> Ms. Rey was accompanied by a class member, Lauren [M].  She had submitted a personal statement and a letter from her physician.  She reported that she was doing much better, now that her problems are controlled by medication.  Her desire is to continue on in the program.  She admitted that the committee has not violated the rules as outlined in the student handbook, and that the committee's actions were not discriminatory.

*Id.* at 16.  The minutes further reflect that the SPC reviewed its past practices as part of the appeals process:

> The precedent most like this case is [Elizabeth J.] with a cumulative GPA below 2.60 at the end of the Spring term of the first year.[8]  <u>The committee voted</u>

---

6.  According to Rey, she was also evaluated in North Carolina over the holiday break by her primary care physician and a cardiologist.

7.  Every dental school syllabus contains information for students to request testing or other accommodations for a disability.  The student handbook also provides detailed information on requesting various leaves of absences from the SDM.  Even so, Rey claims that she did not know about the University's Disability Resources Center or her leave options.  Rey also suggests that the SPC was aware of her alleged disability before her Level I appeal because of Dr. Etzel's "active participation" with the SPC (he was an *ex-officio* member).  *See* Pl.'s RSOF at 19.

8.  Rey contests that Elizabeth J. was an appropriate comparator because there is no indication that she had health issues or a seriously ill father in a distant location (the record only makes reference to some unspecified "personal issues" of Elizabeth J.).  *See* Dep. of O'Donnell at 146,

> unanimously to uphold the original decision for dismissal, with the option to
> withdraw, and the option to re-apply as a first year student, with no guarantee of
> admission.  Dr. Summersgill will write the letter, notify Dr. O'Donnell, and meet
> with the student to outline the guidelines for a Level II appeal.  She may elect to
> withdraw at any time.

*Id.* (emphasis in original).  Although not specifically mentioned, Rey was not represented by a lawyer at the hearing, as the student handbook provides that "[e]xtramural counsel will not be permitted."  *Id.*, ECF No. 25-6 at 26.  Be that as it may, Rey has admitted that she was given sufficient time and opportunity to present the merits of her Level I appeal.

Moreover, the SPC discussed the merits of Rey's appeal and ultimately decided that there were not sufficient extenuating circumstances that would warrant reversing their decision to dismiss her from the program based on her academic performance.  The SPC would not consider allowing Rey to stay with her class and continue in the program, allegedly because she did not possess enough foundational knowledge to pass to her second year.

On June 12, 2014, Dr. Summersgill informed Rey of the SPC's decision on her Level I appeal and advised her of her right to appeal the SPC's recommendation to the Dean.  In a Level II appeal, the Dean has the discretion to either reaffirm the decision of the SPC and deny the appeal or appoint an ad hoc committee to evaluate the merits of the appeal.  The appeal to the Dean must be submitted in writing within ten calendar days and it must include the reasons on which it is based.  According to Rey, she expressed to Dr. Summersgill her desire to pursue a Level II appeal.

On June 16, 2014 – prior to the expiration of the ten day period – Dean Thomas W. Braun issued Rey a letter which stated that he supported the recommendation of the SPC in dismissing her from the program with the option to withdraw and with eligibility to apply as a

---

Def.'s Ex. D.  In doing so, Rey suggests that there were other cases equally, if not more closely, comparable that the SPC did not consider in conjunction with its decision.  *See infra*.

first year student for the class of 2019.  Dean Braun also indicated that his correspondence was in response to Rey's letter requesting an appeal, which she had not yet submitted.  Rey also had not yet submitted additional material that she wished to have Dean Braun consider in conjunction with her Level II appeal.  For his part, Dean Braun contends that he had read Rey's previously prepared personal statement and reviewed additional information presented by Dr. O'Donnell and Dr. Summersgill in arriving at his decision to deny any further appeal.  Afterward, Rey may have e-mailed Dean Braun but made no further attempt to contact him to discuss her dismissal.

At some point after either her Level I or Level II appeal (Rey cannot recall exactly when), Dr. Summersgill and Rey met in his office where he allegedly told her that perhaps she "could start a family now" that she was "not in dental school."  Rey Dep. at 142, Def.'s Ex. A-1, ECF No. 26-4 at 3.  Rey did not report this alleged comment or any other allegation of discrimination to anyone at the University.

On June 18, 2014, Rey began the process of withdrawing from the SDM, which included returning certain items, counseling on her student loan repayment, and reviewing the readmission policy.  During the withdrawal process, Dr. O'Donnell learned from Rey that Dean Braun reaffirmed the decision of the SPC before she had the opportunity to proceed through the formal Level II appeals process.  As such, Dr. O'Donnell advised Rey that, if she had additional evidence to present to Dean Braun, then she should not continue with the withdrawal process and take it to Dean Braun for consideration.  Rey declined to do so.

Since withdrawing from the SDM, Rey has worked for Parexel International as a clinical trial specialist and as a clinical monitoring associate.  Rey has not (re)-applied to the SDM or any other dental schools.

### 4. Alleged Comparators

Since the fall of 2008, the SPC has recommended five students – Daniel G., Joon-Yong K., Michael S., Elizabeth J., and Rey – for dismissal and/or repetition of the first year curriculum because their cumulative GPAs fell below the required minimum of 2.60 after the first two semesters of the first year. None of them were permitted to continue with their class into the summer term of the program. The three male students were required to repeat the year, rather than to reapply following dismissal, as the guidelines for promotion and grading in 2009 did not require a recommendation of dismissal with the option to reapply (it was later changed so that students were not automatically readmitted into the following year's class). Both Rey and Elizabeth J. fell under the current guidelines, however. Aside from Rey, the dismissed students were non-Hispanic.

Nevertheless, Rey contends that other non-Hispanic students were treated more favorably (*i.e.*, given additional opportunities to salvage their education and potential career) where similar cause(s) for academic dismissal existed, such as repeatedly failing courses and board exams as well as remediation attempts regarding same. First, Rey alleges that Paula N., an Asian female student in her class, was given two attempts to remediate a course that she had failed in the fall semester of her first year because of her ethnicity (a final grade of "F" or "U" in any course after remediation of that course – just like failing to meet the 2.60 cumulative GPA cutoff – constitutes grounds for dismissal under the student handbook).[9] Unlike Rey, however, Paula

---

9. A course director has the discretion to determine the method by which a student who receives a failing grade may remediate that course for a passing "C" grade, which is the highest grade a student may achieve after completion of the remediation program. Thus, even if Rey had been permitted to remediate any of her classes, it would not have helped her achieve a GPA above 2.60 because her lowest grade was a "C."

N.'s GPA never dropped below a 2.60 even with a failed course in the fall semester of her first year.

Second, Rey contends that Clint R., a Hispanic male first-year student who completed the spring and summer semesters of his first year with, respectively, a cumulative GPA of 2.596 and 2.580, was treated more favorably.[10]  For the spring semester, the SPC determined that rounding up the student's GPA was appropriate.  In deciding against dismissal, the SPC also considered that (1) his GPA was very close to the 2.60 cutoff; (2) he was an underrepresented minority; and (3) he and his wife had a baby during the summer semester, which interrupted his term.  Altogether, the SDM viewed these as mitigating factors that justified only placing him on academic probation rather than recommending him for dismissal.

Third, Rey suggests that Brian W., a male Caucasian student who had received two "F" grades in an academic year (which is a ground for dismissal), was also treated more favorably.  In his case, the SDM did not dismiss Brian W. but instead granted him a requested leave of absence so that he could undergo surgery for a medical condition.  Brian W. did not have to reapply but was required to repeat the first year of dental school, with a planned reentry into the class of 2019.

Fourth, Rey points to Linda S., a third-year female Caucasian student who the SPC recommended to dismiss due to failed courses and some unprofessional conduct, with the option to re-apply as a first year student but with no guarantee of admission.  The recommendation was not accepted in light of extenuating circumstances: an abusive spouse.

---

10.  The SPC meeting minutes indicate that Clint R. received a 2.580 after the summer term of his first year; however, the University submits that this was a typographical error and that his GPA was actually 2.591.

Fifth, Rey highlights the case of Daniel G., a male Caucasian student who was provided with multiple opportunities despite a litany of negative issues, including a repeated year, a history of missing classes and meetings, concerns about his behavior, low grades (one "D-minus," two "C's" and 2 "I's" in one semester and two "C's" and a "D" in another), a ranking at the bottom of his class, and a patient complaint. After these violations, Daniel G. forged a patient's signature, which led the SPC to recommend dismissal. Dean Braun later reinstated Daniel G., and the SPC again recommended dismissal. Ultimately, Daniel G. remained in school and graduated from the SDM.[11]

## B. Procedural History

Rey commenced this action on February 24, 2015 by filing a four-count Complaint against the University alleging a gender discrimination claim under Title IX of the Education Amendments Of 1972 at Count One, an ethnicity discrimination claim under Title VI of the Civil Rights Act of 1964 at Count Two, and disability discrimination claim(s) under the Americans With Disabilities Act ("ADA") and the Rehabilitation Act of 1973 at Counts Three and Four. Following the close of discovery, this motion followed.

## II. Standard of Review

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under the governing

---

11. It is unclear why Daniel G. was permitted to graduate. The transcript of Dean Braun's deposition does, however, make some reference to Daniel G's dismissal having been the subject of litigation in state court. *See* Pl.'s Ex. 5 at 211, ECF No. 33 at 88.

law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To withstand a motion for summary judgment, the nonmoving party must show a genuine dispute of material fact for trial by citing to particular parts of material in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247-48. In other words, "[w]hen the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c) (1)(A), or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact," Fed. R. Civ. P. 56(c)(1)(B). In reviewing all of the record evidence submitted, the court must draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

The court is not permitted to weigh evidence or to make credibility determinations at this stage. *Anderson*, 477 U.S. at 255. Those functions are for the jury, not the court. *Id.* The court

is thus limited to deciding whether there are any disputed issues and, if so, whether they are both genuine and material.  *Id.*

### III.    Discussion

Rey alleged that the University discriminated against on the basis of her gender, ethnicity and alleged disability.  The University moves for summary judgment on each count.

The burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) is (potentially) applicable to each of the discrimination claims brought by Rey against the University.  *See Manning v. Temple Univ.*, 157 F. App'x 509, 513 (3d Cir. 2005) (Title VI) (citing *Freeman v. Fahey*, 374 F.3d 663, 666 (8th Cir. 2004)); *Petruska v. Gannon Univ.*, No. CIV. A. 1:04-CV-80, 2008 WL 2789260, at *3 (W.D. Pa. Mar. 31, 2008) (Title IX) (citing *Johnson v. Baptist Med. Ctr.*, 97 F.3d 1070, 1072 (8th Cir. 1996); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994); *Preston v. Com. of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206-07 (4th Cir. 1994); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 896-97 (1st Cir. 1988)); *Walsh v. Univ. of Pittsburgh*, No. CIV.A. 13-00189, 2015 WL 128104, at *11 (W.D. Pa. Jan. 8, 2015) (ADA and Rehabilitation Act) (citing *Walton v. Mental Health Ass'n. of Se. Pennsylvania*, 168 F.3d 661, 667-68 (3d Cir. 1999)).

Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination.  *See Smith v. City of Allentown*, 589 F.3d 684, 689-90 (3d Cir. 2009).  If the plaintiff succeeds, the burden of production shifts to the defendant to identify a legitimate non-discriminatory reason for the challenged action.  *Id.*  If the defendant makes that showing, the burden of production returns to the plaintiff to establish that the proffered justification for the adverse action is pretextual.  *Id.*  At all times, however, the burden of persuasion remains with the plaintiff.  *Id.*

## A. Gender Discrimination Claim (Count One)

"To establish a prima facie case of discrimination under Title IX, a plaintiff must allege (1) that [s]he was subjected to discrimination in an educational program; (2) that the program receives federal assistance; and (3) that the discrimination was on the basis of sex." *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 674 (W.D. Pa. 2015). In evaluating these claims, courts often look to the body of law developed under Title VI and Title VII. *Petruska*, 2008 WL 2789260, at *3.

Under that framework, "[a] plaintiff may prove gender discrimination by direct evidence as set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-46 (1989), as modified by the Civil Rights Act of 1991, or indirectly through the familiar burden-shifting framework set forth in *McDonnell Douglas Corp.*" *Thompson v. Tractor Supply Co.*, No. CIV.A. 10-234, 2011 WL 4433268, at *5 (W.D. Pa. Sept. 21, 2011); *see also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 & n.5 (3d Cir. 2016). "'Direct evidence' is evidence sufficient to allow the jury to find that 'the decisionmakers placed substantial negative reliance on [gender] in reaching their decision.'" *Thompson*, 2011 WL 4433268, at *5 (quoting *Price Waterhouse*, 490 U.S. at 277) (alteration in original). "Statements by a non-decisionmaker or a decisionmaker unrelated to the decisional process itself are not direct evidence." *Id.* (citing *Price Waterhouse*, 490 U.S. at 277). To be sure, "'[s]tray remarks in the [particular setting], statements by nondecisionmakers, or even statements by decisionmakers unrelated to the decisional process itself, do not constitute direct evidence of discrimination." *Hodges v. UPMC Presbyterian Shadyside Hosp.*, No. 2:05-CV-1310, 2007 WL 654319, at *3 n.2 (W.D. Pa. Feb. 27, 2007) (quoting *Fakete v. Aetna, Inc*., 152 F. Supp. 2d 722, 733 (E.D. Pa. 2001); *see also Johnson v. McGraw-Hill Companies*, 451 F. Supp. 2d 681, 696 (W.D. Pa. 2006).

Here, Rey contends that "she has both direct and circumstantial evidence of gender discrimination." Pl.'s Br. at 16. Rey does not, however, develop (let alone address) her alternative circumstantial evidence theory. In fact, by the end of her argument, Plaintiff appears to abandon that position. *See id.* at 20 ("Because this case involves direct evidence that may amount to discrimination, the SDM's evidence/argument that Plaintiff was less qualified than other students (indeed [she] had the lowest GPA of her class) does not shift the burden to Plaintiff to present evidence of pretext under the *McDonnell Douglas* framework.").[12] Accordingly, the Court will only address Rey's direct evidence theory.

In support of her claim, Rey points to the alleged comment made by Dr. Summersgill – that perhaps Rey could start a family now that she was not in dental school – as well as the discussion of her wedding by Dr. Etzel at one or more SPC meeting as direct evidence of discrimination. Rey neglects to mention, however, that the only comment by a decision-maker (Dr. Summersgill) was made after the SPC's recommendation that Rey be dismissed from the SDM. Without more, this alleged comment amounts to nothing more than a stray remark unrelated to (and after) the decision-making process. It is also entirely unclear what was said at the SPC meeting(s) regarding Rey's wedding, which hardly allows this Court to assess whether it constitutes direct evidence of discrimination. At most, the record suggests that Rey spoke with Dr. Etzel (an *ex-officio* member of the SPC who did not vote on Rey's academic dismissal) in advance of the SPC meeting because she needed to move her final exam for his class to accommodate her wedding schedule. There is no evidence that the SPC questioned Rey's judgment in planning her wedding in April 2014. In fact, Rey's personal written statement to the

---

12. Perhaps this shift is because Rey's argument is lifted – often verbatim and without attribution – from *Tingley-Kelley v. Trustees of Univ. of Pennsylvania*, 677 F. Supp. 2d 764 (E.D. Pa. 2010), which does delve into a pretext analysis. *See* Pl.'s Br. at 15-20.

SPC – in which she explained that the anticipation of her April 2014 wedding "undoubtedly affected [her] academic performance" and that taking two of her finals early "ended up hurting [her]" – is the only evidence in the record linking her wedding to her poor academic showing.

Accordingly, Rey's gender discrimination claim fails as a matter of law, and the Court will grant the University's motion for summary judgment on Count One of the Complaint.

## B. Ethnicity Discrimination Claim (Count Two)[13]

To make a prima facie showing of ethnicity discrimination "in the education context, a plaintiff must show: (1) that she is a member of a protected class; (2) that she is qualified to continue in pursuit of her education; (3) that she suffered an adverse action; and (4) such action occurred under circumstances giving rise to an inference of discrimination." *K.A.B. ex rel. Susan B. v. Downington Area Sch. Dist.*, No. CIV.A. 11-1158, 2013 WL 3742413, at *11 (E.D. Pa. July 16, 2013) (citing *Blunt v. Lower Merion Sch. Dist.*, 826 F. Supp. 2d 749, 758 (E.D. Pa. 2011)). The parties dispute whether Plaintiff has satisfied the fourth element.

---

13. At Count Two of the Complaint, Rey only alleges a disparate treatment theory of ethnicity discrimination. In her summary judgment filings, however, Rey raises an alternative ethnicity discrimination claim under a disparate impact theory. The University, understandably, objects to this practice. In response, Plaintiff asks that her brief in opposition be deemed an amendment of the Complaint. The Court will deny this request. After all, "[a] plaintiff 'may not amend h[er] complaint through arguments in his brief in opposition to a motion for summary judgment.'" *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) (quoting *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)) (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)); *but see Bradley v. Kemper Ins. Co.*, 121 F. App'x 468, 471 (3d Cir. 2005). Accordingly, the Court will not address Rey's disparate impact "claim" in any great detail. It suffices to say that Rey's proposed disparate impact claim appears to be flawed. For instance, Dr. Summersgill admits that his report – on which the disparate impact claim is based – includes his guesswork regarding the national origin of particular students. *See* ECF No. 33 at 279 ("I listed students whom I knew or suspected to be of a traditionally disadvantaged group, or were fairly recent immigrants. The numbers are an estimate."). This purported analysis is hardly the sort of reliable, statistically significant evidence that can raise an inference of causation. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988).

Relevant here, "[e]vidence that a similarly-situated student outside the protected class was treated differently may raise an inference of discrimination." *Blunt*, 826 F. Supp. 2d at 758 (citing *Manning*, 2004 WL 3019230, at *5). The lack of comparative evidence is not, however, fatal to a plaintiff's prima facie case. *Id.* "Instead, the prima face case is 'flexible and must be tailored to fit the specific context in which it is applied.'" *Id.* (quoting *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)). To be sure, "[c]omparative evidence is just one manner in which a plaintiff can satisfy the prima facie requirement that the adverse action occur under circumstances giving rise to an inference of discrimination." *Id.* (citing *Anderson v. Wachovia Mortgage Corp.*, 621 F.3d 261, 268 (3d Cir. 2010)).

The University contends that Rey, who is of Cuban descent, cannot make out a prima facie case because she fails to identify any non-Hispanic student who was permitted to continue into the second year of the program after achieving a GPA below 2.60 after the first two semesters of the first year. In support of its position, the University also stresses that several non-Hispanic students – Daniel G., Joon-Yong K., Michael S., and Elizabeth J. – have similarly been dismissed and/or forced to repeat their first year SDM curriculum for failing to achieve a 2.60 cumulative GPA after the first two semesters of the first year.

For her part, Rey contends that she was academically dismissed under circumstances giving rise to an inference of discrimination as she can point to comparators outside the protected class who did not suffer the same treatment. In Rey's view, Paula N., Brian W., Daniel G., and Linda S. – all of whom were non-Hispanic students – each experienced academic performance issues far more serious than her case but were not dismissed from the SDM.

Even assuming Rey has made out a prima facie case of ethnicity discrimination, the University has articulated a legitimate non-discriminatory reason for dismissing her from the

program: her cumulative GPA after her first two semesters at the SDM was below the academic minimum set forth in the student handbook. Rey received this handbook and became familiar with it shortly after she started at the SDM. Based on the guidelines, the SDM placed Rey on academic warning after her first semester. The SPC advised Rey to obtain assistance from faculty in the areas where she needed additional help and to contact her faculty coordinator. Rey followed that advice and met with Dr. Nedwick-Castro who offered Rey recommendations to improve her academic performance, such as contacting her professor(s), hiring a tutor, or joining a study group. Rey did not hire a tutor, seek any assistance from her upperclass mentor, or join a more successful study group. As such, her academic performance worsened to the point where she ranked last in her class at the end of second semester, with a spring 2014 GPA of 2.260 and a cumulative GPA of 2.446, which is well below the SDM's 2.60 cutoff. Following the guidelines in the student handbook, the SPC then recommended Rey for dismissal. Dr. O'Donnell, as the Associate Dean for Academic Affairs, accepted the SPC's recommendation to dismiss Rey from the program, and Dean Braun supported this decision.

At this point, Rey must thus show by a preponderance of the evidence that the nondiscriminatory reason articulated by the University is pretextual. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). A plaintiff can establish pretext by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the [defendant's] articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [defendant's] action." *Id.* at 764. To discredit the defendant's articulated reason, a plaintiff must point out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its actions that a reasonable factfinder *could* rationally find them unworthy

of credence, and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons." *Id.* (emphasis in original). To show that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the defendant's action, "the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [ethnicity] was a motivating or determinative factor in the employment decision." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644-45 (3d Cir. 1998).

Rey has not met her burden at this step. She attempts to show pretext by focusing on the discretionary aspects of the dismissal process, alleging that the 2.60 "cut off" itself is somehow pretextual. In essence, however, Rey only questions whether the academic policy is sound. *See, e.g.,* Pl.'s Br. at 12 ("Moreover, notwithstanding all the discretionary aspects of the academic dismissal process employed by the SDM in the context of the 2.60 GPA academic 'cutoff' rule for first-year dental students, there are a number of factors that render the objectiveness and integrity of the 2.60 'cut off' highly questionable and subject to challenge."). It is not enough, however, for a plaintiff to complain that "the [defendant's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the [defendant], not whether the [it] is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765. Worse yet, Rey simply labels the testimony of (unnamed) SDM witnesses as "conclusory," "unsubstantiated," and "entitled to little weight," without identifying any weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the University's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence. This shortfall does little to advance her claim.

Throughout, Rey also suggests that other non-Hispanic students were (in her view) treated more favorably in (what she contends to be) similar academic situations, such as remediating a course twice (Paula N.), failing multiple courses (Brian W.), engaging in unprofessional conduct (Linda. S.), and violating several guidelines and policies (Daniel G.). But Rey fails to account for the particular (and sometimes extenuating) circumstances of each student, rending them distinguishable from her case. In fact, Rey can point to only one instance in which a student received a GPA below 2.60 after the first two semesters and was permitted to continue with the program – Clint R. who, like Rey, is Hispanic. As such, Rey has not shown "that the [defendant] has previously discriminated against the plaintiff, that the [defendant] has discriminated against members of the plaintiff's protected class or another protected class, or that similarly situated people not within plaintiff's class were treated more favorably." *Peake v. Pennsylvania State Police*, No. 15-2669, 2016 WL 1019252, at *4 (3d Cir. Mar. 15, 2016) (citing *Simpson*, 142 F.3d at 645). In other words, Rey has not shown pretext.

Accordingly, Rey's ethnicity discrimination claim fails as a matter of law, and the Court will grant the University's motion for summary judgment on Count Two of the Complaint.

### C. Disability Discrimination Claim(s) (Counts Three & Four)

The same substantive standards govern both Rey's Rehabilitation Act and ADA claims, and therefore, the Court "may address both claims in the same breath." *Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd Of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009) (quoting *McDonald v. Pennsylvania*, 62 F.3d 92, 95 (3d Cir. 1995)). "To prevail on a violation of either of those statutes, [a plaintiff] ha[s] to demonstrate that [s/he] (1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of her disability." *Id.*

21

Relevant here, a defendant "cannot be found to have violated the ADA or the Rehabilitation Act for failing to grant an accommodation to [a] plaintiff based on an alleged disability of which it had no knowledge, nor any reason to know, while plaintiff was enrolled in [its institution]. *Ferrell v. Howard Univ.*, No. 98-1009 DAR, 1999 WL 1290834, at *6 (D.D.C. Dec. 2, 1999). "A relevant aspect of this inquiry is whether the student ever put the . . . school on notice of h[er] handicap by making 'a sufficiently direct and specific request for special accommodations.'" *Gill v. Franklin Pierce Law Ctr.*, 899 F. Supp. 850, 855 (D.N.H. 1995) (quoting *Nathanson v. Medical College of Pa.*, 926 F.2d 1368, 1386 (3d Cir. 1991)).

Rey did not do so in this case. By her own admission, Rey did not disclose her alleged severe panic disorder as a disability requiring an accommodation to either the SPC prior to her Level I appeal or her course directors in either semester. Nor did she report her alleged disability to the University's Disability Resources Center, seek any testing accommodations for her exams, or request a leave of absence, even though the information on how to do so was readily available to Rey. At most, Plaintiff told Dr. Etzel on the last day of exams that "[she] was not able to study at all the night before because [she] had been throwing up, [her] heart rate was elevated, [she] could not concentrate, and [she] was worried about the final in microbiology." Dep. of Rey at 36-37. But this sole conversation between Rey and Dr. Etzel is not sufficient to put the University on notice of her alleged disability. Accordingly, the Court will grant the University's motion for summary judgment on Counts Three and Four of the Complaint.

## IV. Conclusion

For the reasons hereinabove stated, the Court will grant the University's motion for summary judgment. An appropriate Order follows.

McVerry, S.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHLOE REY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **2:15-cv-248** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNIVERSITY OF PITTSBURGH SCHOOL OF DENTAL MEDICINE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER OF COURT</u>

AND NOW, this 20th day of April, 2016, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the MOTION FOR SUMMARY JUDGMENT (ECF No. 23) filed by Defendant University of Pittsburgh School of Dental Medicine (the "University") is **GRANTED**. The Clerk shall docket this case **CLOSED**.

BY THE COURT:

<u>s/Terrence F. McVerry</u>
Senior United States District Judge